(Slip Opinion) OCTOBER TERM, 2007 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FLORIDA DEPARTMENT OF REVENUE *v.* PICCA-DILLY CAFETERIAS, INC.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 07–312.  Argued March 26, 2008—Decided June 16, 2008

After respondent (Piccadilly) declared bankruptcy under Chapter 11, but before its plan was submitted to the Bankruptcy Court, that court authorized Piccadilly to sell its assets, approved its settlement agreement with creditors, and granted it an exemption under 11 U. S. C. §1146(a), which provides a tax-stamp exemption for any asset transfer "under a plan confirmed under section 1129."  After the sale, Piccadilly filed its Chapter 11 plan, but before the plan could be confirmed, petitioner Florida Department of Revenue (Florida) objected, arguing that the stamp taxes it had assessed on certain of the transferred assets fell outside §1146(a)'s exemption because the transfer had not been under a confirmed plan.  The court granted Piccadilly summary judgment.  The Eleventh Circuit affirmed, holding that §1146(a)'s exemption applies to preconfirmation transfers necessary to the consummation of a confirmed Chapter 11 plan, provided there is some nexus between such transfers and the plan; that §1146(a)'s text was ambiguous and should be interpreted consistent with the principle that a remedial statute should be construed liberally; and that this interpretation better accounted for the practicalities of Chapter 11 cases because a debtor may need to transfer assets to induce relevant parties to endorse a proposed plan's confirmation.

*Held:* Because §1146(a) affords a stamp-tax exemption only to transfers made pursuant to a Chapter 11 plan that has been confirmed, Piccadilly may not rely on that provision to avoid Florida's stamp taxes. The most natural reading of §1146(a)'s text, the provision's placement within the Bankruptcy Code, and applicable canons of statutory construction lead to this conclusion. Pp. 4–19.

(a) Florida's reading of §1146(a) is the most natural.  Contending

that the text unambiguously limits stamp-tax exemptions to postconfirmation transfers made under the authority of a confirmed plan, Florida argues that "plan confirmed" denotes a plan confirmed in the past, and that "under" should be read to mean "with the authorization of" or "inferior or subordinate" to its referent, here the confirmed plan, see *Ardestani* v. *INS*, 502 U. S. 129, 135.  Piccadilly counters that the provision does not unambiguously impose a temporal requirement, contending that had Congress intended "plan confirmed" to mean "confirmed plan," it would have used that language, and that "under" is as easily read to mean "in accordance with."  While both sides present credible interpretations, Florida's is the better one. Congress could have used more precise language and thus removed all ambiguity, but the two readings are not equally plausible.  Piccadilly's interpretation places greater strain on the statutory text than Florida's simpler construction.  And Piccadilly's emphasis on the distinction between "plan confirmed" and "confirmed plan" is unavailing because §1146(a) specifies not only that a transfer be "under a plan," but also that the plan be confirmed pursuant to §1129.  Ultimately this Court need not decide whether §1146(a) is unambiguous on its face, for, based on the parties' other arguments, any ambiguity must be resolved in Florida's favor.  Pp. 4–7.

(b) Even on the assumption that §1146(a)'s text is ambiguous, reading it in context with other relevant Code provisions reveals nothing justifying Piccadilly's claims that had Congress intended §1146(a) to apply exclusively to postconfirmation transfers, it would have made its intent plain with an express temporal limitation, and that "under" should be construed broadly to mean in "in accordance with."  If statutory context suggests anything, it is that §1146(a) is inapplicable to preconfirmation transfers.  The provision's placement in a subchapter entitled "POSTCONFIRMATION MATTERS" undermines Piccadilly's view that it extends to preconfirmation transfers.  Piccadilly's textual and contextual arguments, even if fully accepted, would establish at most that the statutory language is ambiguous, not that the purported ambiguity should be resolved in Piccadilly's favor.  Pp. 7–13.

(c) The federalism canon articulated in *California State Bd. of Equalization* v. *Sierra Summit, Inc.*, 490 U. S. 844, 851–852—that courts should "proceed carefully when asked to recognize an exemption from state taxation that Congress has not clearly expressed"— obliges the Court to construe §1146(a)'s exemption narrowly.  Piccadilly's interpretation would require the Court to do exactly what the canon counsels against: recognize an exemption that Congress has not clearly expressed, namely, an exemption for preconfirmation transfers.  The various substantive canons on which Piccadilly relies

Syllabus

for its interpretation—most notably, that a remedial statute should be construed liberally—are inapposite in this case. Pp. 13–19.

484 F. 3d 1299, reversed and remanded.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, SOUTER, GINSBURG, and ALITO, JJ., joined. BREYER, J., filed a dissenting opinion, in which STEVENS, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 07–312

FLORIDA DEPARTMENT OF REVENUE, PETITIONER *v.* PICCADILLY CAFETERIAS, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[June 16, 2008]

JUSTICE THOMAS delivered the opinion of the Court.

The Bankruptcy Code provides a stamp-tax exemption for any asset transfer "under a plan confirmed under [Chapter 11]" of the Code. 11 U. S. C. §1146(a) (2000 ed., Supp. V). Respondent Piccadilly Cafeterias, Inc., was granted an exemption for assets transferred after it had filed for bankruptcy but before its Chapter 11 plan was submitted to, and confirmed by, the Bankruptcy Court. Petitioner, the Florida Department of Revenue, seeks reversal of the decision of the Court of Appeals upholding the exemption for Piccadilly's asset transfer. Because we hold that §1146(a)'s stamp-tax exemption does not apply to transfers made before a plan is confirmed under Chapter 11, we reverse the judgment below.

I

Piccadilly was founded in 1944 and was one of the Nation's most successful cafeteria chains until it began experiencing financial difficulties in the last decade. On October 29, 2003, Piccadilly declared bankruptcy under Chapter 11 of the Bankruptcy Code, §1101 *et seq.* (2000 ed. and Supp. V), and requested court authorization to sell

substantially all its assets outside the ordinary course of
business pursuant to §363(b)(1) (2000 ed., Supp. V). Pic-
cadilly prepared to sell its assets as a going concern and
sought an exemption from any stamp taxes on the even-
tual transfer under §1146(a) of the Code.[1]  The Bank-
ruptcy Court conducted an auction in which the winning
bidder agreed to purchase Piccadilly's assets for $80
million.

  On January 26, 2004, as a precondition to the sale,
Piccadilly entered into a global settlement agreement with
committees of senior secured noteholders and unsecured
creditors.  The settlement agreement dictated the priority
of distribution of the sale proceeds among Piccadilly's
creditors.  On February 13, 2004, the Bankruptcy Court
approved the proposed sale and settlement agreement.
The court also ruled that the transfer of assets was ex-
empt from stamp taxes under §1146(a).  The sale closed on
March 16, 2004.

  Piccadilly filed its initial Chapter 11 plan in the Bank-
ruptcy Court on March 26, 2004, and filed an amended
plan on July 31, 2004.[2]  The plan provided for distribution

———————

  [1] When litigation commenced in the lower courts, the stamp-tax ex-
emption was contained in §1146(c) (2000 ed.).  In 2005, Congress
repealed subsections (a) and (b), and the stamp-tax exemption was
recodified as §1146(a).  See Bankruptcy Abuse Prevention and Con-
sumer Protection Act of 2005, §719(b)(3), 119 Stat. 133.  For simplicity,
we will cite the provision as it is currently codified.

  [2] Chapter 11 bankruptcy proceedings ordinarily culminate in the
confirmation of a reorganization plan.  But in some cases, as here, a
debtor sells all or substantially all its assets under §363(b)(1) (2000 ed.,
Supp. V) before seeking or receiving plan confirmation.  In this sce-
nario, the debtor typically submits for confirmation a plan of liquida-
tion (rather than a traditional plan of reorganization) providing for the
distribution of the proceeds resulting from the sale.  Here, Piccadilly
filed a Chapter 11 liquidation plan after selling substantially all its
assets as a going concern.  Although the central purpose of Chapter 11
is to facilitate reorganizations rather than liquidations (covered gener-
ally by Chapter 7), Chapter 11 expressly contemplates liquidations.

of the sale proceeds in a manner consistent with the set-
tlement agreement. Before the Bankruptcy Court con-
firmed the plan, Florida filed an objection, seeking a dec-
laration that the $39,200 in stamp taxes it had assessed
on certain of Piccadilly's transferred assets fell outside
§1146(a)'s exemption because the transfer had not been
"under a plan confirmed" under Chapter 11. On October
21, 2004, the bankruptcy court confirmed the plan. On
cross-motions for summary judgment on the stamp-tax
issue, the Bankruptcy Court granted summary judgment
in favor of Piccadilly, reasoning that the sale of substan-
tially all Piccadilly's assets was a transfer "'under'" its
confirmed plan because the sale was necessary to con-
summate the plan. App. D to Pet. for Cert. 40a–41a. The
District Court upheld the decision on the ground that
§1146(a), in certain circumstances, affords a stamp-tax
exemption even when a transfer occurs prior to confirma-
tion. *In re Piccadilly Cafeterias, Inc.*, 379 B. R. 215, 226
(SD Fla. 2006).

The Court of Appeals for the Eleventh Circuit affirmed,
holding that "§1146[(a)]'s tax exemption may apply to
*those* pre-confirmation transfers that are necessary to the
consummation of a confirmed plan of reorganization,
which, at the very least, requires that there be some nexus
between the pre-confirmation transfer and the confirmed
plan." *In re Piccadilly Cafeterias, Inc.*, 484 F. 3d 1299,
1304 (2007) *(per curiam)*. Finding the statutory text
ambiguous, the Court of Appeals concluded that §1146(a)
should be interpreted consistent with "the principle that a
remedial statute such as the Bankruptcy Code should be
liberally construed." *Ibid.* The court further noted that its

--------

See §1129(a)(11) (2000 ed.) ("Confirmation of the plan is not likely to be
followed by the liquidation, or the need for further financial reorganiza-
tion, of the debtor or any successor to the debtor under the plan, unless
such liquidation or reorganization is proposed in the plan").

interpretation of §1146(a) better accounted for "the practical realities of Chapter 11 reorganization cases" because a debtor may need to transfer assets to induce relevant parties to endorse the proposed confirmation of a plan. *Ibid.* The Court of Appeals acknowledged that its holding conflicted with the approach taken by the Courts of Appeals for the Third and Fourth Circuits, *id.*, at 1302, which have held that §1146(a) "does not apply to . . . transactions that occur prior to the confirmation of a plan under Chapter 11 of the Bankruptcy Code." *In re Hechinger Inv. Co. of Del.*, 335 F. 3d 243, 246 (CA3 2003); see also *In re NVR, LP*, 189 F. 3d 442, 458 (CA4 1999) (holding that §1146(a) "appl[ies] only to transfers under the Plan occurring after the date of confirmation").

We granted certiorari, 552 U. S. ___ (2007), to resolve the conflict among the Courts of Appeals as to whether §1146(a) applies to preconfirmation transfers.

## II

Section 1146(a), entitled "Special tax provisions," provides: "The issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer *under a plan confirmed under section 1129 of this title*, may not be taxed under any law imposing a stamp tax or similar tax." (Emphasis added.) Florida asserts that §1146(a) applies only to postconfirmation sales; Piccadilly contends that it extends to preconfirmation transfers as long as they are made in accordance with a plan that is eventually confirmed. Florida and Piccadilly base their competing readings of §1146(a) on the provision's text, on inferences drawn from other Code provisions, and on substantive canons of statutory construction. We consider each of their arguments in turn.

## A

Florida contends that §1146(a)'s text unambiguously

limits stamp-tax exemptions to postconfirmation transfers made under the authority of a confirmed plan. It observes that the word "confirmed" modifies the word "plan" and is a past participle, *i.e.*, "[a] verb form indicating past or completed action or time that is used as a verbal adjective in phrases such as *baked beans* and *finished work."* American Heritage Dictionary 1287 (4th ed. 2000). Florida maintains that a past participle indicates past or completed action even when it is placed after the noun it modifies, as in "beans baked in the oven," or "work finished after midnight." Thus, it argues, the phrase "plan confirmed" denotes a "confirmed plan"—meaning one that has been confirmed in the past.

Florida further contends that the word "under" in "under a plan confirmed" should be read to mean "with the authorization of" or "inferior or subordinate" to its referent, here the confirmed plan. See *Ardestani* v. *INS*, 502 U. S. 129, 135 (1991) (noting that a thing that is "'under'" a statute is most naturally read as being "'subject to'" or "'governed by'" the statute). Florida points out that, in the other two appearances of "under" in §1146(a), it clearly means "subject to." Invoking the textual canon that "'identical words used in different parts of the same act are intended to have the same meaning,'" *Commissioner* v. *Keystone Consol. Industries, Inc.*, 508 U. S. 152, 159 (1993), Florida asserts the term must also have its core meaning of "subject to" in the phrase "under a plan confirmed." Florida thus reasons that to be eligible for §1146(a)'s exemption, a transfer must be subject to a plan that has been confirmed subject to §1129 (2000 ed. and Supp. V). Echoing the Fourth Circuit's reasoning in *NVR, supra,* at 457, Florida concludes that a transfer made prior to the date of plan confirmation cannot be subject to, or under the authority of, something that did not exist at the time of the transfer—a confirmed plan.

Piccadilly counters that the statutory language does not

unambiguously impose a temporal requirement. It contends that "plan confirmed" is not necessarily the equivalent of "confirmed plan," and that had Congress intended the latter, it would have used that language, as it did in a related Code provision. See §1142(b) (referring to "any instrument required to effect a transfer of property dealt with by a confirmed plan"). Piccadilly also argues that "under" is just as easily read to mean "in accordance with." It observes that the variability of the term "under" is well-documented, noting that the American Heritage Dictionary 1395 (1976) provides 15 definitions, including "[i]n view of," "because of," "by virtue of," as well as "[s]ubject to the restraint . . . of." See also *Ardestani*, *supra,* at 135 (recognizing that "[t]he word 'under' has many dictionary definitions and must draw its meaning from its context"). Although "under" appears several times in §1146(a), Piccadilly maintains there is no reason why a term of such common usage and variable meaning must have the same meaning each time it is used, even in the same sentence. As an illustration, it points to §302(a) of the Bankruptcy Code, which states, "The commencement of a joint case under a chapter of this title constitutes an order for relief under such chapter." Piccadilly contends that this provision is best read as: "The commencement of a joint case *subject to the provisions of* a chapter of this title constitutes an order for relief *in* such chapter." Piccadilly thus concludes that the statutory text—standing alone—is susceptible of more than one interpretation. See *Hechinger*, *supra*, at 253 ("[W]e cannot say that the language of [§1146(a)] rules out the possibility that 'under a plan confirmed' means 'in agreement with a plan confirmed'").

While both sides present credible interpretations of §1146(a), Florida has the better one. To be sure, Congress could have used more precise language—*i.e.*, "under a plan *that has been* confirmed"—and thus removed all ambiguity. But the two readings of the language that Congress

chose are not equally plausible: Of the two, Florida's is clearly the more natural. The interpretation advanced by Piccadilly and adopted by the Eleventh Circuit—that there must be "some nexus between the pre-confirmation transfer and the confirmed plan" for §1146(a) to apply, 484 F. 3d, at 1304—places greater strain on the statutory text than the simpler construction advanced by Florida and adopted by the Third and Fourth Circuits.

Furthermore, Piccadilly's emphasis on the distinction between "plan confirmed" and "confirmed plan" is unavailing because §1146(a) specifies not only that a tax-exempt transfer be "under a plan," but also that the plan in question be confirmed pursuant to §1129. Congress' placement of "plan confirmed" before "under section 1129" avoids the ambiguity that would have arisen had it used the term "confirmed plan," which could easily be read to mean that the transfer must be "under section 1129" rather than under a plan that was itself confirmed under §1129.

Although we agree with Florida that the more natural reading of §1146(a) is that the exemption applies only to postconfirmation transfers, ultimately we need not decide whether the statute is unambiguous on its face. Even assuming, *arguendo*, that the language of §1146(a) is facially ambiguous, the ambiguity must be resolved in Florida's favor. We reach this conclusion after considering the parties' other arguments, to which we now turn.

B

Piccadilly insists that, whatever the degree of ambiguity on its face, §1146(a) becomes even more ambiguous when read in context with other Bankruptcy Code provisions. Piccadilly asserts that if Congress had intended §1146(a) to apply exclusively to transfers occurring after confirmation, it would have made its intent plain with an express temporal limitation similar to those appearing elsewhere in the Code. For example, §1127 governs modifications to

a Chapter 11 plan, providing that the proponent of a plan
may modify the plan "at any time before confirmation," or,
subject to certain restrictions, "at any time after confirma-
tion of such plan." §§1127(a)–(b). Similar examples
abound. See, *e.g.*, §1104(a) ("[a]t any time after the com-
mencement of the case but before confirmation of a plan
. . ."); §1104(c) ("[a]t any time before the confirmation of a
plan . . ."). Piccadilly emphasizes that, "where Congress
includes particular language in one section of a statute but
omits it in another section of the same Act, it is generally
presumed that Congress acts intentionally and purposely
in the disparate inclusion or exclusion." *Russello* v. *United
States*, 464 U. S. 16, 23 (1983) (internal quotation marks
omitted). Because Congress did not impose a clear and
commonly used temporal limitation in §1146(a), Piccadilly
concludes that Congress did not intend one to exist. Pic-
cadilly buttresses its conclusion by pointing out that
§1146(b)—the subsection immediately following
§1146(a)—includes an express temporal limitation. See
§1146(b) (2000 ed., Supp. V) (providing that a bankruptcy
court may declare certain tax consequences after the date
a government unit responds to a plan proponent's request
or "270 days after such request," whichever is earlier).
But Congress included no such limitation in subsection
(a).

Piccadilly also relies on other Code provisions to bolster
its argument that the term "under" preceding "a plan
confirmed" in §1146(a) should be read broadly—to mean
"in accordance with" rather than the narrower "authorized
by." Apart from §302, discussed above, Piccadilly adverts
to §111, which states that an agency providing credit
counseling to debtors is required to meet "the standards
set forth under this section." §111(b)(4)(A) (2000 ed.,
Supp. V). Piccadilly argues that this language requires
the agency to meet "the standards set forth *in* this sec-
tion," because reading the quoted language to mean "the

standards set forth *authorized by* this section" would render the words "set forth" nonsensical. Piccadilly additionally refers to §303(a), which provides that "[a]n involuntary case may be commenced only under chapter 7 or 11 of this title." Again, Piccadilly asserts that this language means "an involuntary case may be commenced only *in* chapter 7 or 11 of this title." It reasons that "under" in §303(a) cannot mean "authorized by" because §303(a) itself authorizes involuntary cases, and the provisions of Chapters 7 and 11 do not. Piccadilly makes a similar argument with respect to §343, which provides that "[t]he debtor shall appear and submit to examination under oath at the meeting of creditors." Reading "under" to mean "authorized by" would make little sense here. On the basis of these examples, Piccadilly concludes that the term "under" is ambiguous.

Finally, Piccadilly maintains that "under" in §1146(a) should be construed broadly in light of §365(g)(1) of the Bankruptcy Code, which provides that rejection of an executory contract or unexpired lease constitutes the equivalent of a prebankruptcy breach "if such contract or lease has not been assumed under this section or under a plan confirmed under chapter . . . 11." In *Hechinger*, the Third Circuit concluded that substituting "authorized by" for "under" in §1146(a) would be consistent with the use of the parallel language in §365(g)(1). 335 F. 3d, at 254. Piccadilly attempts to refute *Hechinger*'s reading of §365(g)(1), asserting that, because authorization for the assumption of a lease under a plan is described in §1123(b)(2), which "circles back to section 365," such authorization cannot be "subject to" or "authorized by" Chapter 11. Brief for Respondent 39 (emphasis deleted); see 11 U. S. C. §1123(b)(2) (providing that "a plan may . . . subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under

such section"). The phrase "under a plan confirmed" in §365(g)(1), contends Piccadilly, is thus best read to mean "*in accordance with* a plan confirmed" because a plan may provide for the assumption of an executory contract or unexpired lease but not—unlike §365—be the ultimate authority for that assumption. As a result, Piccadilly concludes that the identical language of §1146(a) should have the same meaning.

Piccadilly supports this point with its assertion that, unlike sales, postconfirmation assumptions or rejections are not permitted under the Bankruptcy Code. See *NLRB* v. *Bildisco & Bildisco*, 465 U. S. 513, 529 (1984) (stating that in "a Chapter 11 reorganization, a debtor-in-possession has until a reorganization plan is confirmed to decide whether to accept or reject an executory contract"). Because, as Piccadilly contends, the phrase "under a plan confirmed under chapter . . . 11" in §365(g)(1) cannot refer to assumptions or rejections occurring after confirmation, it would be anomalous to read the identical phrase in §1146(a) to cover *only* postconfirmation transfers.

For its part, Florida argues that the statutory context of §1146(a) supports its position that the stamp-tax exemption applies exclusively to postconfirmation transfers. It observes that the subchapter in which §1146(a) appears is entitled, "POSTCONFIRMATION MATTERS." Florida contends that, while not dispositive, the placement of a provision in a particular subchapter suggests that its terms should be interpreted consistent with that subchapter. See *Davis* v. *Michigan Dept. of Treasury*, 489 U. S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme"). In addition, Florida dismisses Piccadilly's references to the temporal limitations in other Code provisions on the ground that it would have been superfluous for Congress to add any further limitations to

§1146(a)'s already unambiguous temporal element.

Even on the assumption that the text of §1146(a) is ambiguous, we are not persuaded by Piccadilly's contextual arguments. As noted above, Congress could have used language that made §1146(a)'s temporal element clear beyond question. Unlike §1146(a), however, the temporal language examples quoted by Piccadilly are indispensable to the operative meaning of the provisions in which they appear. Piccadilly's reliance on §1127, for example, is misplaced because that section explicitly differentiates between preconfirmation modifications, see §1127(a), and postconfirmation modifications, which are permissible "only if circumstances warrant" them, §1127(b). It was unnecessary for Congress to include in §1146(a) a phrase such as "at any time after confirmation of such plan" because the phrase "under a plan confirmed" is most naturally read to require that there be a confirmed plan at the time of the transfer.

Even if we were to adopt Piccadilly's broad definition of "under," its interpretation of the statute faces other obstacles. The asset transfer here can hardly be said to have been consummated "in accordance with" any confirmed plan because, as of the closing date, Piccadilly had not even submitted its plan to the Bankruptcy Court for confirmation. Piccadilly's asset sale was thus not conducted "in accordance with" any plan confirmed under Chapter 11. Rather, it was conducted "in accordance with" the procedures set forth in Chapter 3—specifically, §363(b)(1). To read the statute as Piccadilly proposes would make §1146(a)'s exemption turn on whether a debtor-in-possession's actions are consistent with a legal instrument that does not exist—and indeed may not even be conceived of—at the time of the sale. Reading §1146(a) in context with other relevant Code provisions, we find nothing justifying such a curious interpretation of what is a straightforward exemption.

Nor does anything in §365(g)(1) recommend Piccadilly's reading of §1146(a).  Section 365(g) generally allows a trustee to reject "an executory contract or unexpired lease of the debtor," *i.e.*, to reject a contract that is unfavorable to the estate, subject to court approval.  As the text makes clear, such approval may occur either under "this section," §365(g)—*i.e.*, "at any time before the confirmation of a plan," §365(d)(2)—or "under a plan confirmed under chapter 9, 11, 12, or 13," §365(g)(1).  Piccadilly relies heavily on *Bildisco*, *supra*, in which this Court held that §365 permits a debtor-in-possession to reject a collective-bargaining agreement like any other executory contract, and that doing so is not an unfair labor practice under the National Labor Relations Act.  In reaching this conclusion, the Court observed that "a debtor-in-possession has until a reorganization plan is confirmed *to decide* whether to accept or reject an executory contract." 465 U. S., at 529 (emphasis added).

We agree with *Bildisco*'s commonsense observation that the *decision* whether to reject a contract or lease must be made before confirmation.  But that in no way undermines the fact that the rejection takes *effect* upon or after confirmation of the Chapter 11 plan (or before confirmation if pursuant to §365(d)(2)).  In the context of §1146(a), the decision whether to transfer a given asset "under a plan confirmed" must be made prior to submitting the Chapter 11 plan to the bankruptcy court, but the transfer itself cannot be "under a plan confirmed" until the court confirms the plan in question.  Only at that point does the transfer become eligible for the stamp-tax exemption. [3]

–––––––––

[3] Also meritless is Piccadilly's argument that "under" in the phrase "under a plan confirmed under chapter . . . 11" in §365(g)(1) cannot be read to mean "subject to" because §1123(b)(2), in Piccadilly's words, "circles back to section 365."  Brief for Respondent 39.  Section 1123(b)(2) authorizes a plan to provide for the assumption, rejection, or assignment of an executory contract or unexpired lease, but requires

If the statutory context suggests anything, it is that §1146(a) is inapplicable to preconfirmation transfers. We find it informative that Congress placed §1146(a) in a subchapter entitled, "POSTCONFIRMATION MATTERS." To be sure, a subchapter heading cannot substitute for the operative text of the statute. See, *e.g.*, *Pennsylvania Dept. of Corrections* v. *Yeskey*, 524 U. S. 206, 212 (1998) ("'[T]he title of a statute . . . cannot limit the plain meaning of the text'"). Nonetheless, statutory titles and section headings "'are tools available for the resolution of a doubt about the meaning of a statute.'" *Porter* v. *Nussle*, 534 U. S. 516, 528 (2002). The placement of §1146(a) within a subchapter expressly limited to postconfirmation matters undermines Piccadilly's view that §1146(a) covers preconfirmation transfers.

But even if we were fully to accept Piccadilly's textual and contextual arguments, they would establish at most that the statutory language is ambiguous. They do not— and largely are not intended to—demonstrate that §1146(a)'s purported ambiguity should be resolved in Piccadilly's favor. Florida argues that various nontextual canons of construction require us to resolve any ambiguity in its favor. Piccadilly responds with substantive canons of its own. It is to these dueling canons of construction that we now turn.

## C

Florida contends that even if the statutory text is deemed ambiguous, applicable substantive canons compel its interpretation of §1146(a). Florida first invokes the canon that "Congress is presumed to be aware of an ad-

---

that the plan do so in a manner consistent with the various requirements set forth throughout §365. By contrast, the phrase "under this section" in §365(g)(1) serves as a reference to §365(d)(2), which permits preconfirmation assumptions and rejections pursuant to a court order (and not, as in §1123(b)(2), pursuant to a confirmed plan).

ministrative or judicial interpretation of a statute and to
adopt that interpretation when it reenacts a statute with-
out change." *Lorillard* v. *Pons*, 434 U. S. 575, 580–581
(1978). Florida observes that the relevant language of
§1146(a) relating to "under a plan confirmed" has re-
mained unchanged since 1978 despite several revisions of
the Bankruptcy Code. The most recent revision in 2005
occurred after the Fourth Circuit's decision in *NVR* and
the Third Circuit's decision in *Hechinger* but before the
Eleventh Circuit's decision below. Florida asserts that
Congress ratified this longstanding interpretation when,
in its most recent amendments to the Code, it "readopted"
the stamp-tax provision verbatim as §1146(a). Brief for
Petitioner 26.

Florida also invokes the substantive canon—on which
the Third Circuit relied in *Hechinger*—that courts should
"'proceed carefully when asked to recognize an exemption
from state taxation that Congress has not clearly ex-
pressed.'" 335 F. 3d, at 254 (quoting *California State Bd.
of Equalization* v. *Sierra Summit, Inc.*, 490 U. S. 844, 851–
852 (1989)). In light of this directive, Florida contends
that §1146(a)'s language must be construed strictly in
favor of the States to prevent unwarranted displacement
of their tax laws. See *National Private Truck Council, Inc.*
v. *Oklahoma Tax Comm'n,* 515 U. S. 582, 590 (1995) (dis-
cussing principles of comity in taxation and the "federal
reluctance to interfere with state taxation" given the
"strong background presumption against interference").

Furthermore, Florida notes that the canon also discour-
ages federal interference with the administration of a
State's taxation scheme. See *id.*, at 586, 590. Florida
contends that the Court of Appeals' extension of §1146(a)
to preconfirmation transfers directly interferes with the
administration of the State's stamp tax, which is imposed
"prior to recordation" of the instrument of transfer. Fla.
Stat. §§201.01, 201.02(1) (2006). Extending the exemption

to transfers that occurred months or years before a confirmable plan even existed, Florida explains, may require the States to "'unravel'" stamp taxes already collected. Brief for Petitioner 31. Alternatively, should a court grant an exemption under §1146(a) before confirmation, States would be saddled with the task of monitoring whether the plan is ever eventually confirmed.

In response, Piccadilly contends that the federalism principle articulated in *Sierra Summit, supra,* at 852, does not apply where there is a "clear expression of an exemption from state taxation" overriding a State's authority to tax. In Piccadilly's view, that is precisely the case with regard to §1146(a), which proscribes the imposition of stamp taxes and demonstrates Congress' intent to exempt a category of state taxation.

Piccadilly further maintains that Florida's stamp tax is nothing more than a postpetition claim, specifically an administrative expense, which is paid as a priority claim ahead of the prepetition claims of most creditors. Equating Florida's receipt of tax revenue with a preference in favor of a particular claimant, Piccadilly argues that §1146(a)'s ambiguous exemption should not be construed to diminish other claimants' recoveries. See *Howard Delivery Service, Inc.* v. *Zurich American Ins. Co.*, 547 U. S. 651, 667 (2006) (emphasizing that "provisions allowing preferences must be tightly construed"). Reading the stamp-tax exemption too narrowly, Piccadilly maintains, "'is not only inconsistent with the policy of equality of distribution'" but also "'dilutes the value of the priority for those creditors Congress intended to prefer'"—those with prepetition claims. Brief for Respondent 54 (quoting *Howard Delivery Serv., supra*, at 667).

Above all, Piccadilly urges us to adopt the Court of Appeals' maxim that "a remedial statute such as the Bankruptcy Code should be liberally construed." 484 F. 3d, at 1304; cf. *Isbrandtsen Co.* v. *Johnson*, 343 U. S. 779,

782 (1952). In Piccadilly's view, any ambiguity in the statutory text is overshadowed by §1146(a)'s obvious purpose: to facilitate the Chapter 11 process "through giving tax relief." *In re Jacoby-Bender, Inc.*, 758 F. 2d 840, 841 (CA2 1985). Piccadilly characterizes the tax on asset transfers at issue here as tantamount to a levy on the bankruptcy process itself. A stamp tax like Florida's makes the sale of a debtor's property more expensive and reduces the total proceeds available to satisfy the creditors' claims, contrary to Congress' clear intent in enacting §1146(a).

What is unclear, Piccadilly argues, is why "Congress would have intended the anomaly that a transfer essential to a plan that occurs two minutes before confirmation may be taxed, but the same transfer occurring two seconds after may not." Brief for Respondent 43. After all, interpreting §1146(a) in the manner Florida proposes would lead precisely to that result. And that, Piccadilly asserts, is "absurd" in light of §1146(a)'s policy aim—evidenced by the provision's text and legislative history—of reducing the cost of asset transfers. In that vein, Piccadilly contends that interpreting §1146(a) to apply solely to postconfirmation transfers would undermine Chapter 11's twin objectives of "preserving going concerns and maximizing property available to satisfy creditors." *Bank of America Nat. Trust and Sav. Assn.* v. *203 North LaSalle Street Partnership*, 526 U. S. 434, 453 (1999). In order to obtain the maximum value for its assets—especially assets rapidly declining in value—Piccadilly claims that a debtor often must close the sale before formal confirmation of the Chapter 11 plan.

We agree with Florida that the federalism canon articulated in *Sierra Summit* and elsewhere obliges us to construe §1146(a)'s exemption narrowly. Piccadilly's effort to evade the canon falls well short of the mark because reading §1146(a) in the manner Piccadilly proposes would

require us to do exactly what the canon counsels against. If we recognized an exemption for preconfirmation transfers, we would in effect be "'recogniz[ing] an exemption from state taxation that *Congress has not clearly expressed*'"—namely, an exemption for preconfirmation transfers. *Sierra Summit*, 490 U. S., at 851–852 (emphasis added); see also *Swarts* v. *Hammer*, 194 U. S. 441, 444 (1904) (reasoning that if Congress endeavored to exempt a debtor from state and local taxation, "the intention would be clearly expressed, not left to be collected or inferred from disputable considerations of convenience in administering the estate of the bankrupt"). Indeed, Piccadilly proves precisely this point by resting its entire case on the premise that Congress has expressed its stamp-tax exemption in ambiguous language. Therefore, far from being inapposite, the canon is decisive in this case.

The canons on which Piccadilly relies are inapposite. While we agree with Piccadilly that "provisions allowing preferences must be tightly construed," *Howard Delivery Serv., supra*, at 667, §1146(a) is not a preference-granting provision. The statutory text makes no mention of preferences.

Nor are we persuaded that in this case we should construe §1146(a) "liberally" to serve its ostensibly "remedial" purpose. Based on the Eleventh Circuit's declaration that the Bankruptcy Code is a "remedial statute," Piccadilly would stretch the disallowance well beyond what the statutory text can naturally bear. Apart from the opinion below, however, the only authority Piccadilly offers is a 1952 decision of this Court interpreting the Shipping Commissioners Act of 1872. See Brief for Respondent 54 (citing *Isbrandtsen, supra,* at 782). But unlike the statutory scheme in *Isbrandtsen*, which was "'designed to secure the comfort and health of seamen aboard ship, hospitalization at home and care abroad,'" 343 U. S., at 784 (quoting *Aguilar* v. *Standard Oil Co. of N. J.*, 318 U. S.

724, 728 (1943)), the Bankruptcy Code—and Chapter 11 in particular—is not a remedial statute in that sense. To the contrary, this Court has rejected the notion that "Congress had a single purpose in enacting Chapter 11." *Toibb* v. *Radloff*, 501 U. S. 157, 163 (1991). Rather, Chapter 11 strikes a balance between a debtor's interest in reorganizing and restructuring its debts and the creditors' interest in maximizing the value of the bankruptcy estate. *Ibid.* The Code also accommodates the interests of the States in regulating property transfers by "'generally [leaving] the determination of property rights in the assets of a bankrupt's estate to state law.'" *Travelers Casualty & Surety Co. of America* v. *Pacific Gas & Elec. Co.*, 549 U. S. ___, ___ (2007) (slip op., at 7 ). Such interests often do not coincide, and in this case, they clearly do not. We therefore decline to construe the exemption granted by §1146(a) to the detriment of the State.

As for Piccadilly's assertion that reading §1146(a) to allow preconfirmation transfers to be taxed while exempting others moments later would amount to an "absurd" policy, we reiterate that "'it is not for us to substitute our view of . . . policy for the legislation which has been passed by Congress.'" *Hechinger*, 335 F. 3d, at 256. That said, we see no absurdity in reading §1146(a) as setting forth a simple, bright-line rule instead of the complex, after-the-fact inquiry Piccadilly envisions. At bottom, we agree with the Fourth Circuit's summation of §1146(a):

> "Congress struck a most reasonable balance. If a debtor is able to develop a Chapter 11 reorganization and obtain confirmation, then the debtor is to be afforded relief from certain taxation to facilitate the implementation of the reorganization plan. Before a debtor reaches this point, however, the state and local tax systems may not be subjected to federal interference." *NVR*, 189 F. 3d, at 458.

Lastly, to the extent the "practical realities" of Chapter 11 reorganizations are increasingly rendering postconfirmation transfers a thing of the past, see 484 F. 3d, at 1304, it is incumbent upon the Legislature, and not the Judiciary, to determine whether §1146(a) is in need of revision. See, *e.g.*, *Ali* v. *Federal Bureau of Prisons*, 552 U. S. \_\_\_, \_\_\_ (2008) (slip op., at 14 ) ("We are not at liberty to rewrite the statute to reflect a meaning we deem more desirable").

### III

The most natural reading of §1146(a)'s text, the provision's placement within the Code, and applicable substantive canons all lead to the same conclusion: Section 1146(a) affords a stamp-tax exemption only to transfers made pursuant to a Chapter 11 plan that has been confirmed. Because Piccadilly transferred its assets before its Chapter 11 plan was confirmed by the Bankruptcy Court, it may not rely on §1146(a) to avoid Florida's stamp taxes. Accordingly, we reverse the judgment below and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 07–312

## FLORIDA DEPARTMENT OF REVENUE, PETITIONER *v.* PICCADILLY CAFETERIAS, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[June 16, 2008]

JUSTICE BREYER, with whom JUSTICE STEVENS joins, dissenting.

The Bankruptcy Code provides that the "transfer" of an asset "*under a plan confirmed under section 1129 of this title,* may not be taxed under any law imposing a stamp tax or similar tax." 11 U. S. C. §1146(a) (2000 ed., Supp V) (previously §1146(c)) (emphasis added). In this case, the debtor's reorganization "plan" provides for the "transfer" of assets. But the "plan" itself was not "confirmed under section 1129 of this title" (*i.e.*, the Bankruptcy Judge did not formally approve the plan) until *after* the "transfer" of assets took place. See §1129 (2000 ed. and Supp. V) (detailing the requirements for bankruptcy court approval of a Chapter 11 plan).

Hence we must ask whether the time of transfer matters. Do the statutory words "under a plan confirmed under section 1129 of this title" apply only where a transfer takes place "under a plan" that at the time of the transfer *already has been* "confirmed under section 1129 of this title"? Or, do they also apply where a transfer takes place "under a plan" that *subsequently is* "confirmed under section 1129 of this title"? The Court concludes that the statutory phrase applies only where a transfer takes place "under a plan" that at the time of transfer *already has been* "confirmed under section 1129 of this title." In my

view, however, the statutory phrase applies "under a plan"
that at the time of transfer either *already has been* or
*subsequently is* "confirmed." In a word, the majority be-
lieves that the time (pre- or post-transfer) at which the
bankruptcy judge confirms the reorganization plan mat-
ters. I believe that it does not. (And construing the provi-
sion to refer to a plan that simply "is" confirmed would
require us to read fewer words into the statute than the
Court's construction, which reads the provision to refer
only to a plan "that has been" confirmed, *ante*, at 19.)

The statutory language itself is perfectly ambiguous on
the point. Linguistically speaking, it is no more difficult to
apply the words "plan confirmed" to instances in which the
"plan" *subsequently is* "confirmed" than to restrict their
application to instances in which the "plan" *already has
been* "confirmed." See *In re Piccadilly Cafeterias, Inc.*, 484
F. 3d 1299, 1304 (CA11 2007) *(per curiam)* ("[T]he statute
can plausibly be read either as describing eligible trans-
fers to include transfers 'under a plan confirmed' regard-
less of *when* the plan is confirmed, *or* . . . imposing a tem-
poral restriction on when the confirmation of the plan
must occur" (emphasis in original)). Cf. *In re Hechinger
Inv. Co. of Del.,* 335 F. 3d 243, 252–253 (CA3 2003) (major-
ity opinion of Alito, J.) (noting more than one "plausible
interpretation"); *In re NVR, LP*, 189 F. 3d 442, 458 (CA4
1999) (Wilkinson, J., concurring in part and concurring in
judgment) ("equally possible that the provision requires
only that the transfer occur 'under'—i.e., that it be inferior
or subordinate to—'a plan' that is ultimately 'confirmed'").
But cf. *ante*, at 7 (majority believes its reading is "clearly
the more natural").

Nor can I find any text-based argument that points
clearly in one direction rather than the other. Indeed, the
majority, after methodically combing the textualist
beaches, finds that a comparison with other somewhat
similar phrases in the Bankruptcy Code sheds little light.

For example, on the one hand, if Congress thought the time of confirmation mattered, why did it not say so expressly as it has done elsewhere in the Code? See, *e.g.*, 11 U. S. C. §1127(b) (plan proponent may modify it "at any time *after* confirmation" (emphasis added)); §1104(a) ("[a]t any time after the commencement of the case but *before* confirmation" (emphasis added)); §1104(c) ("at any time *before* the confirmation of a plan" (emphasis added)); §1114(e)(2) ("*before* a plan confirmed under section 1129 of this title is effective" (emphasis added)). On the other hand, if Congress thought the time of confirmation did *not* matter, why did it place this provision in a subchapter entitled "POSTCONFIRMATION MATTERS"? See 11 U. S. C., ch. 11, subch. III. (And yet one could also argue that the tax exemption provision appears under the "postconfirmation matters" title because the trigger for the exemption is plan confirmation. Thus, the exemption is a "postconfirmation matter," regardless of when the transfer occurs.)

The canons of interpretation offer little help. And the majority, for the most part, seems to agree. It ultimately rests its interpretive conclusion upon this Court's statement that courts "must proceed carefully when asked to recognize an exemption from state taxation that Congress has not clearly expressed." *California State Bd. of Equalization* v. *Sierra Summit, Inc.*, 490 U. S. 844, 851–852 (1989) (internal quotation marks omitted). See *ante*, at 17. But when, as here, we interpret a provision the *express point of which* is to exempt some category of state taxation, how can the statement in *Sierra Summit* prove determinative? See §1146(a) ("The issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, *may not be taxed* under any law imposing a stamp tax or similar tax" (emphasis added)).

Neither does Florida's related claim, protesting federal

interference in the *administration* of a State's taxation scheme seem plausible. See Brief for Petitioner 32–33 (noting the "additional difficulties and complexities that will proliferate" under the lower court's decision). *If* Florida now requires transferees to file a *pre-existing* confirmed plan in order to avoid payment of the stamp tax, then why could Florida not require a transferee under a not-yet-confirmed plan to pay the stamp tax and then file the plan after its confirmation in order to obtain a refund? (If there is some other, less curable, practical problem, Florida has not explained what it is.) Given these difficulties, I suspect that the majority's reliance upon *Sierra Summit*'s "canon," *ante*, at 14, reflects no more than an effort to find the proverbial "any port" in this interpretive storm.

The absence of a clear answer in text or canons, however, should not lead us to judicial despair. Consistent with Court precedent, we can and should ask a further question: *Why* would Congress have insisted upon temporal limits? What reasonable *purpose* might such limits serve? See, *e.g.*, *Dolan* v. *Postal Service*, 546 U. S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, *considering the purpose* and context of the statute, and consulting any precedents or authorities that inform the analysis" (emphasis added)); *Robinson* v. *Shell Oil Co.*, 519 U. S. 337, 346 (1997) (the Court's construction of a statute's meaning based in part on its consideration of the statute's *"primary purpose"* (emphasis added)). In fact, the majority's reading of temporal limits in §1146(a) serves *no reasonable congressional purpose at all.*

The statute's purpose is apparent on its face. It seeks to further Chapter 11's basic objectives: (1) "preserving going concerns" and (2) "maximizing property available to satisfy creditors." *Bank of America Nat. Trust and Sav. Assn.* v. *203 North LaSalle Street Partnership*, 526 U. S. 434,

453 (1999). See also *Toibb* v. *Radloff*, 501 U. S. 157, 163 (1991) (Chapter 11 "embodies the general [Bankruptcy] Code policy of maximizing the value of the bankruptcy estate"). As an important bankruptcy treatise notes, "[i]n addition to tax relief, the purpose of the exemption of [§1146(a)] is to encourage and facilitate bankruptcy asset sales." 8 Collier on Bankruptcy ¶1146.02, p. 1146–3 (15th ed. rev. 2005). It furthers these objectives where, *e.g.*, asset transfers are at issue, by turning over to the estate (for the use of creditors or to facilitate reorganization) funds that otherwise would go to pay state stamp taxes on plan-related transferred assets. The requirement that the transfers take place pursuant to a reorganization "plan" that is "confirmed" provides the bankruptcy judge's assurance that the transfer meets with creditor approval and the requirements laid out in §1129.

How would the majority's temporal limitation further these statutory objectives? It would not do so in any way. From the perspective of these purposes, it makes no difference whether a transfer takes place before or after the plan is confirmed. In both instances the exemption puts in the hands of the creditors or the estate money that would otherwise go to the State in the form of a stamp tax. In both instances the confirmation of the related plan assures the legitimacy (from bankruptcy law's perspective) of the plan that provides for the assets transfer.

Moreover, one major reason why a transfer may take place *before* rather than *after* a plan is confirmed is that the preconfirmation bankruptcy process takes time. As the Administrative Office of the United States Courts recently reported, "[a] Chapter 11 case may continue for many years." Bankruptcy Basics (Apr. 2006), online at http://www.uscourts.gov/bankruptcycourts/bankruptcybasics/chapter11.html (as visited June 13, 2008, and available in Clerk of Court's case file). Accord, *In re Hechinger Inv. Co. of Del.*, 254 B. R. 306, 320 (Bkrtcy. Ct. Del. 2000) (noting it

may run "a year or two"). And a firm (or its assets) may have more value (say, as a going concern) where sale takes place quickly. As the District Court in this case acknowledged, "there are times when it is more advantageous for the debtor to begin to sell as many assets as quickly as possible in order to insure that the assets do not lose value." *In re Piccadilly Cafeterias, Inc.,* 379 B. R. 215, 224 (SD Fla. 2006) (internal quotations marks and alteration omitted). See, *e.g.*, *In re Webster Classic Auctions, Inc.*, 318 B. R. 216, 219 (Bkrtcy. Ct. MD Fla. 2004) (recognizing "the inestimable benefit to a Chapter 11 estate to sell a piece of property at the most opportune time—whether pre- or postconfirmation—as opposed to requiring all concerned to wait for a postconfirmation sale in order to receive the tax relief Congress obviously intended"); *In re Medical Software Solutions*, 286 B. R. 431, 441 (Bkrtcy. Ct. Utah 2002) (approving preconfirmation sale of debtor's assets recognizing that the assets' "value is reducing rapidly" and there was only a narrow window for a viable sale of the assets). Thus, an immediate sale can often make more revenue available to creditors or for reorganization of the remaining assets. Stamp taxes on related transfers simply reduce the funds available for any such legitimate purposes. And insofar as the Court's interpretation of the statute reduces the funds made available, that interpretation inhibits the statute's efforts to achieve its basic objectives.

Worse than that, if the potential loss of stamp tax revenue threatens delay in implementing any such decision to sell, then creditors (or the remaining reorganized enterprise) could suffer far more serious harm. They could lose the extra revenues that a speedy sale might otherwise produce. See, *e.g.*, *In re Met-L-Wood Corp.*, 861 F. 2d 1012, 1017 (CA7 1988) (as suppliers and customers "shy away," it can make sense quickly to sell business to other owners so that it "can continue" to operate "free of the

stigma and uncertainty of bankruptcy"). In the present case, for example, Piccadilly, by selling assets quickly after strategic negotiation, realized $80 million, considerably more than the $54 million originally offered before Piccadilly filed for bankruptcy. That fact, along with the Bankruptcy Court's finding of "sound business reasons" for the prompt sale of Piccadilly's assets and that the expeditious sale was "in the best interests of creditors of [Piccadilly] and other parties in interest," App. 32a, suggest that considerably less would have been available for creditors had Piccadilly waited until after the plan's confirmation to execute the sale plan.

What conceivable reason could Congress have had for silently writing into the statute's language a temporal distinction with such consequences? The majority can find none. It simply says that the result is not "'absurd'" and notes the advantages of a "bright-line rule." *Ante*, at 18. I agree that the majority's interpretation is not absurd and do not dispute the advantages of a clear rule. But I think the statute supplies a clear enough rule—transfers are exempt when there is confirmation and are not exempt when there is no confirmation. And I see no reason to adopt the majority's preferred construction (that only transfers completed after plan confirmation are exempt), where it conflicts with the statute's purpose.

Of course, we should not substitute "'"*our view* of . . . policy"'" for the statute that Congress enacted. *Ante*, at 18 (emphasis added). But we certainly should consider *Congress'* view of the policy for the statute it created, and that view inheres in the statute's purpose. "Statutory interpretation is not a game of blind man's bluff. Judges are free to consider statutory language in light of a statute's basic purposes." *Dole Food Co.* v. *Patrickson*, 538 U. S. 468, 484 (2003) (BREYER, J., concurring in part and dissenting in part). It is the majority's failure to work with this important tool of statutory interpretation that

has led it to construe the present statute in a way that, in my view, runs contrary to what Congress would have hoped for and expected.

   For these reasons, I respectfully dissent.