*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-CF-0455

CLIFTON A. BROWNE, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2021-CF1-006943)

(Hon. Marisa J. Demeo, Trial Judge)

(Argued October 8, 2024                                    Decided March 6, 2025)

*Sean R. Day* for appellant.

*Peter F. Andrews*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney at the time of argument, and *Chrisellen R. Kolb*, *Nicholas P. Coleman*, and *Dennis G. Clark, Jr.*, Assistant United States Attorneys, were on the brief, for appellee.

Before MCLEESE, DEAHL, and HOWARD, *Associate Judges*.

MCLEESE, *Associate Judge*: Appellant Clifton A. Browne challenges the trial court's pretrial ruling that the United States could use Mr. Browne's prior convictions in Maryland for second-degree assault to impeach Mr. Browne if he

testified at trial. We affirm the trial court's ruling and therefore affirm Mr. Browne's conviction for voluntary manslaughter.

## I. Factual and Procedural Background

The evidence at trial included the following. Luther Brooks was renting the basement unit of a house in the District of Columbia that was owned by Valerie Mann. Ms. Mann was interested in selling her house, so she told Mr. Brooks that he would need to vacate the unit, which caused some tension in their relationship. Ms. Mann needed to do some work on the house before placing it on the market, so she enlisted the help of her friend's nephew, Mr. Browne. While discussing repairs that needed to be done, Ms. Mann told Mr. Browne that Mr. Brooks had been "dragging his feet" about vacating the unit. Believing that Mr. Brooks might be taking advantage of Ms. Mann, Mr. Browne offered to talk with Mr. Brooks "man to man."

After Mr. Browne went down to the basement, a physical altercation broke out between Mr. Browne and Mr. Brooks. Ms. Mann testified about the altercation as follows. Mr. Browne knocked on the door to Mr. Brooks's unit, and the two began talking. Their voices escalated, and Ms. Mann heard shouting and cursing. Mr. Browne kicked the closed door to Mr. Brooks's unit, and then Mr. Brooks ran out of the unit carrying a big stick. Mr. Brooks banged the stick into Mr. Browne's

chest, which caused Mr. Browne to fall into the laundry room across from Mr. Brooks's unit. From there, Mr. Browne ran into Mr. Brooks's unit, and the two began physically fighting. Ms. Mann entered the unit, and she saw Mr. Browne straddled on Mr. Brooks. Mr. Browne was repeatedly punching Mr. Brooks, and Ms. Mann did not see Mr. Brooks fighting back. Ms. Mann attempted to pull Mr. Browne off of Mr. Brooks, and Ms. Mann eventually got Mr. Browne to stand up. Mr. Brooks, however, was unable to stand up and began to wobble while speaking incoherently. Mr. Brooks was also bleeding from his nose. Ms. Mann then went to retrieve her phone so that she could call 911 for an ambulance, while Mr. Browne took Mr. Brooks outside for some air. As Ms. Mann was calling 911, Mr. Brooks fell and hit his head on concrete.

Ms. Mann told the 911 operator that Mr. Brooks had fallen down six or seven steps, was barely conscious, and was bleeding from his head. Ms. Mann did not mention the altercation with Mr. Browne. Emergency medical personnel eventually arrived and took Mr. Brooks to the emergency room for treatment. Police officers also came to Ms. Mann's home, and Ms. Mann did not mention the altercation to the police, instead telling the police that Mr. Brooks had fallen. After Mr. Brooks was taken to the hospital and the police had left, Mr. Browne cleaned up a few blood stains that were left on the carpet in Mr. Brooks's unit during the fight.

Mr. Brooks never regained consciousness after the altercation, and he was taken off of life support approximately eleven days later. The medical examiner concluded that the cause of death was multiple blunt force injuries to Mr. Brooks's head and neck that caused Mr. Brooks's brain to swell and hemorrhage. Mr. Brooks also suffered multiple blunt force injuries to his torso and ribs. The death was classified as a homicide.

Mr. Browne spoke to the police at the scene of the incident, saying that Mr. Brooks had fallen down the stairs. The police later recorded a phone interview with Mr. Browne, who gave the following account of the altercation. Ms. Mann entered her basement and knocked on the door to Mr. Brooks's unit before placing a key into the door. Mr. Brooks verbally responded in a combative manner that the two should leave and then rushed out of the door swinging a stick. Mr. Browne pushed Ms. Mann out of the way, but Mr. Brooks struck Mr. Browne with the stick, knocking Mr. Browne to the ground. Mr. Browne stood up and entered "self-defense mode" because he believed Mr. Brooks was trying to "kill" or "hurt" him. The two started "rumbling," moving from the entry further into the unit. During the struggle, Mr. Browne "picked up" Mr. Brooks and "slammed him" to the ground. Mr. Browne also hit Mr. Brooks with "body shot[s] and head shots" and at one point got on top of Mr. Brooks and "beat[] him." Mr. Browne eventually "threw" Mr. Brooks outside at the direction of Ms. Mann, who had told Mr. Browne

that Mr. Brooks needed to "go."  Mr. Brooks hit a wall and did not get up from the ground.

Mr. Browne was charged with second-degree murder.  Before trial, the United States filed a motion asking the trial court to rule that if Mr. Browne testified at trial, he could be impeached with prior convictions in Maryland for second-degree assault. The United States relied on D.C. Code § 14-305(b)(1), which (with exceptions not applicable here) requires the trial court to admit evidence that a witness was convicted of a criminal offense "punishable by death or imprisonment in excess of one year under the law under which [the witness] was convicted."  The United States further explained that second-degree assault in Maryland is punishable by more than one year of imprisonment.  Md. Code Ann., Crim. Law § 3-203(b) (West 2015) (authorizing punishment of up to ten years of imprisonment).

Mr. Browne objected, but the trial court ruled that Mr. Browne could be impeached with the convictions at issue if he testified.  Mr. Browne elected not to testify at trial.  The jury found Mr. Browne not guilty of second-degree murder but guilty of the lesser-included offense of voluntary manslaughter.

## II. Analysis

Mr. Browne argues that the trial court erred by ruling that the United States could use his Maryland convictions for second-degree assault to impeach his credibility if he testified. As a threshold matter, the United States contends that Mr. Browne forfeited this argument by electing not to testify. We need not address the issue of forfeiture. Rather, we assume without deciding that Mr. Browne properly preserved this argument, and we hold that the trial court correctly ruled that Mr. Browne's Maryland convictions for second-degree assault are impeachable convictions under Section 14-305(b)(1).

"We review issues of statutory interpretation de novo." *Lucas v. United States*, 240 A.3d 328, 335 (D.C. 2020). Generally, "we will give effect to the plain meaning of a statute when the language is unambiguous and does not produce an absurd result." *Yazam, Inc. v. D.C. Dep't of For-Hire Vehicles*, 310 A.3d 616, 623 (D.C. 2024) (brackets and internal quotation marks omitted). "The plain meaning of a statute may not be controlling, however, when there is a clearly expressed legislative intention to the contrary." *Id.* (internal quotation marks omitted). "We consider statutory context and structure, evident legislative purpose, and the potential consequences of adopting a given interpretation." *Id.* (internal quotation marks omitted). "We may also look to the legislative history to ensure that our

interpretation is consistent with legislative intent." *Id.* (internal quotation marks omitted). "When interpreting statutes, we assume that the legislature acted logically and rationally and we avoid interpretations of statutes which lead to implausible results." *Wade v. United States*, 173 A.3d 87, 95 (D.C. 2017) (internal quotation marks omitted).

> In pertinent part, Section 14-305(b)(1) provides that

>> for the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a criminal offense shall be admitted . . . if the criminal offense (A) was punishable by death or imprisonment in excess of one year under the law under which he was convicted . . . .

The language of the statute is clear and unambiguous: with exceptions not applicable here, if a witness was convicted of a criminal offense that is punishable by more than one year of imprisonment, that conviction is admissible in order to impeach the witness's credibility. Section 14-305(b)(1) is equally clear that to determine whether a conviction was punishable by more than one year of imprisonment, courts must look to "the law under which [the witness] was convicted." *Id.* As we have noted, in Maryland, second-degree assault is punishable by "imprisonment not exceeding 10 years." Md. Code Ann., Crim. Law § 3-203(b). Thus, under the plain language of Section 14-305(b)(1), Mr. Browne's Maryland convictions for second-degree assault are admissible for impeachment purposes.

Mr. Browne argues, however, that (1) Maryland convictions for second-degree assault cannot be used to impeach witnesses under Maryland law; (2) the Maryland offense of second-degree assault is equivalent to the offense of simple assault in the District of Columbia, and convictions for the latter offense are not impeachable under Section 14-305(b)(1); and (3) it therefore would be "absurd and plainly unjust" to treat Maryland second-degree assault convictions as basis for impeachment under Section 14-305(b)(1). The United States does not dispute the first two steps in Mr. Browne's argument, and we agree that Mr. Browne is correct about those points. *See Rosales v. State*, 206 A.3d 916, 931 (Md. 2019) (explaining that misdemeanor convictions for acts of violence such as assault are typically inadmissible under Maryland Rule 5-609 because such "a conviction . . . is not relevant to a witness' credibility"); Md. Code Ann., Crim. Law § 3-203(a) & (b) (second-degree assault is misdemeanor and simply requires proof of assault); *Ross v. United States*, 520 A.2d 1064, 1065 (D.C. 1987) (conviction in D.C. for "simple assault . . . is not an impeachable offense" under Section 14-305(b)(1)). We disagree, however, that it follows that it is absurd to treat Maryland second-degree assault convictions as basis for impeachment under Section 14-305(b)(1).

Section 14-305(b)(1)'s plain terms reflect Congress's choice to make the question of whether a prior conviction can be used to impeach a witness in D.C. Superior Court depend on a bright-line rule: the punishment available for the

conviction in the jurisdiction in which the conviction was imposed. Indeed, the legislative history of Section 14-305(b)(1) indicates that Congress wanted to overturn the approach reflected in *Luck v. United States*, 348 F.2d 763, 768 (D.C. Cir. 1965), which gave trial courts discretion over whether to allow impeachment by prior conviction. H.R. Rep. No. 91-907, at 62-63 (1970). Finding the discretionary rule "unworkable" and "inconsistent with the practice in the vast majority of other jurisdictions," Congress removed trial-court discretion and adopted a clear bright-line rule. *Id.* at 63.

Because other jurisdictions take varying approaches to what types of convictions can be used for impeachment, it necessarily follows from Congress's choice of a bright-line rule that sometimes a conviction can be used for impeachment in Superior Court even though the conviction could not be used for impeachment under the law of the jurisdiction in which the conviction was imposed. Similarly, because jurisdictions vary as to the amount of punishment that may be imposed for given conduct, it equally follows that sometimes a conviction from another jurisdiction can be used for impeachment in Superior Court even though a conviction in the District of Columbia for the same conduct could not be used for impeachment in Superior Court. In other words, the points that Mr. Browne raises are not absurdities that would warrant disregarding the plain language of Section 14-305(b)(1). Rather, they are entirely predictable consequences of

Congress's choice to adopt the bright-line rule. *See generally, e.g., Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 52 (2008) (Court "see[s] no absurdity in reading [statute] as setting forth a simple, bright-line rule"; "[I]t is not for us to substitute our view of policy for the legislation which has been passed by Congress.") (ellipsis and internal quotation marks omitted); *Delong v. Dep't of Health & Hum. Servs.*, 264 F.3d 1334, 1343 (Fed. Cir. 2001) ("Like all bright-line rules, [25 U.S.C.] § 3207 is both over-inclusive and under-inclusive, but the imprecision of the statute does not make it unconstitutional"; Congress "could rationally have concluded . . . that the expense and other difficulties of individual determination justified the inherent imprecision of a prophylactic rule.") (internal quotation marks omitted).

As Mr. Browne notes, the House Committee Report relating to Section 14-305(b)(1) does indicate that the Committee intended to preclude the impeachment use "primarily" of convictions for misdemeanor crimes "of passion and short temper, such as assault." H.R. Rep. No. 91-907, at 62; *Henson v. United States*, 399 A.2d 16, 20 (D.C. 1979) (Historically, "felony" was defined as "any offense for which the maximum penalty . . . [was] imprisonment for more than one year," and "all other crimes [were] misdemeanors."). If Congress had wanted to use the categories of "felony" and "misdemeanor" as the dividing line for admissibility of evidence of prior convictions, however, Congress would have used those terms in

the text of the statute. *See Booz Allen Hamilton, Inc. v Off. of Tax & Revenue*, 308 A.3d 1205, 1210 (D.C. 2024) ("[T]he unambiguous text of the [statute] is strong evidence that [Congress] intended to do precisely what that language says."). Instead, Congress chose a numerical cutoff, and "[i]t is not within the judicial function to rewrite the statute." *Allman v. Snyder*, 888 A.2d 1161, 1169 (D.C. 2005) (internal quotation marks and ellipsis omitted).

"Normally, the plain language and ordinary meaning of a statute control." *Booz Allen Hamilton*, 308 A.3d at 1210 (internal quotation marks omitted). "The burden on a litigant who seeks to disregard the plain meaning of the statute is a heavy one." *Id.* (brackets, ellipsis, and internal quotation marks omitted). We hold that Mr. Browne has failed to carry that burden.

For the foregoing reasons, we affirm the judgment of the Superior Court.

*So ordered.*