# Third District Court of Appeal

## State of Florida

Opinion filed April 20, 2016.
Not final until disposition of timely filed motion for rehearing.

_____

Nos. 3D14-1467, 3D14-1466, 3D14-1465, 3D14-1451
Lower Tribunal Nos. 09-3107, 09-3575
_____

**Miami-Dade County, et al.,**
Appellants,

vs.

**In Re: Florida Power & Light Co., etc., et al.,**
Appellees.

Appeals from the Florida Department of Environmental Protection.

Abigail Price-Williams, Miami-Dade County Attorney, and Dennis A. Kerbel, Assistant County Attorney; Nabors Giblin & Nickerson, P.A., and William C. Garner (Tallahassee); Thomas F. Pepe, City Attorney; Victoria Méndez, City Attorney, and John A. Greco, Deputy City Attorney, and Forrest L. Andrews and Matthew Haber, Assistant City Attorneys, for appellants.

Michael S. Tammaro (Juno Beach); Hopping Green & Sams, P.A., and Peter C. Cunningham and Brooke E. Lewis (Tallahassee); Holland & Knight, LLP, and Rodolfo Sorondo; Franscisco J. Pines; Craig D. Varn, General Counsel, and Francine M. Ffolkes, Administrative Law Counsel (Tallahassee), for appellees.

Wasson & Associates, Chartered, and Roy D. Wasson, for The Friends of the Underline, Inc., as amicus curiae.

Before LAGOA, EMAS and FERNANDEZ, JJ.

FERNANDEZ, J.

The City of Miami, Miami-Dade County ("the County"), the Village of Pinecrest, and the City of South Miami, et al., supported by amicus curiae, appeal the same Final Order on Certification rendered by Florida's State Siting Board, including a Recommended Order and approved Conditions of Certification, which permits appellee Florida Power & Light Company ("FPL") to construct and operate two new nuclear generating units and associated facilities at Turkey Point, in addition to allowing FPL to install miles of new transmission lines. The parties appeal a number of issues, a few of which overlap.[1] We reverse and remand because the Siting Board failed to apply the City of Miami's applicable land development regulations, the Siting Board erroneously thought it did not have the power to require FPL to install the lines underground at FPL's expense, and the Siting Board erred in interpreting the County's East Everglades Ordinance as a zoning regulation, rather than an environmental one. [2]

***Factual Background***

1. ***The Florida Electrical Power Plant Siting Act***

---

[1] The Village of Pinecrest adopts the City of Miami's positions.

[2] There were many issues that were dealt with below via stipulations and agreements. We decline to discuss those issues.

2

Sections 403.501-.518, Florida Statutes (2013) are known as the "Florida Electrical Power Plant Siting Act" ("PPSA"). The PPSA governs certification of new power plants and its associated facilities. Section 403.502 describes the legislative intent, which states:

The Legislature finds that the present and predicted growth in electric power demands in this state requires the development of a procedure for the selection and utilization of sites for electrical generating facilities and the identification of a state position with respect to each proposed site and its associated facilities. The Legislature recognizes that the selection of site and the routing of associated facilities, including transmission lines, will have a significant impact upon the welfare of the population, the location and growth of industry, and the use of the natural resources of the state. The Legislature finds that the efficiency of the permit application and review process at both the state and local level would be improved with the implementation of a process whereby a permit application would be centrally coordinated and all permit decisions could be reviewed on the basis of the standards and recommendations of the deciding agencies. It is the policy of this state that, while recognizing the pressing need for increased power generation facilities, the state shall ensure through available and reasonable methods that the location and operation of electrical power plants will produce minimal adverse effects on human health, the environment, the ecology of the land and its wildlife, and the ecology of state waters and their aquatic life and will not unduly conflict with the goals established by the applicable local comprehensive plans. It is the intent to seek courses of action that will fully balance the increasing demands for electrical power plant location and operation with the broad interests of the public. Such action will be based on these premises:

(1) To assure the citizens of Florida that operation safeguards are technically sufficient for their welfare and protection.

(2) To effect a reasonable balance between the need for the facility and the environmental impact resulting from construction and operation of the facility, including air and water quality, fish and wildlife, and the water resources and other natural resources of the state.

3

(3) To meet the need for electrical energy as established pursuant to s. 403.519.

(4) To assure the citizens of Florida that renewable energy sources and technologies, as well as conservation measures, are utilized to the extent reasonably available.

See § 403.502, Fla. Stat. (2013). Specifically, section 403.509(3) outlines a certification test which the Siting Board, comprised of the Governor and his cabinet, must apply when it holds hearings to approve in whole, approve with modifications or conditions, or deny a new project. The test requires the submitted application to include the following, in pertinent part:

a) Provide reasonable assurance that operational safeguards are technically sufficient for the public welfare and protection.

b) Comply with applicable nonprocedural requirements of agencies.

c) Be consistent with applicable local government comprehensive plans and land development regulations.

d) Meet the electrical energy needs of the state in an orderly, reliable, and timely fashion.

e) Effect a reasonable balance between the need for the facility as established pursuant to s. 403.519 and the impacts upon air and water quality, fish and wildlife, water resources, and other natural resources of the state resulting from the construction and operation of the facility.

f) Minimize through the use of reasonable and available methods, the adverse effects on human health, the environment, and the ecology of the land and its wildlife and the ecology of state waters and their aquatic life.

g) Serve and protect the broad interests of the public.

In addition, the PPSA requires transmission line corridors to adhere to the same certification test as the rest of the power plant project. See § 403.509(4)(a).

## 2. The East Everglades Ordinance

The East Everglades is a unique section of land with a biologically diverse ecosystem. In 1980, the East Everglades Resources Planning Project issued a "Proposed Management Plan for the East Everglades." In 1981, to implement the Management Plan, the Miami-Dade County Board of County Commissioners designated the East Everglades Area of Critical Environmental Concern ("East Everglades") and adopted regulations to protect the natural ecosystem of the East Everglades. These were codified as Chapter 33B, Article II, Divisions1-4 of the Miami-Dade County Code (known as "The East Everglades Ordinance" or Chapter 33B).

The East Everglades was designated first, then in 1989 the Park expanded into Everglades National Park. The eastern boundary of the East Everglades is the L-31N canal, which is also the eastern boundary of Everglades National Park.

The East Everglades Ordinance's statement of legislative intent declared:

> It is the purpose of this designation to protect the public health, safety and welfare by assuring orderly development of the designated area and minimal degradation of those natural ecosystems described in Section 33B-13; by requiring that the functional integrity of natural ecosystems as described in Section 33B-13 is protected; by assuring the maintenance of the present surface and subsurface hydrology within those lands described in Section 33B-13; by providing for the protection of the ecological form and function of the Everglades National Park, its estuarine areas and adjacent wetlands,

5

and to maintain the capability of the natural environment to sustain a proposed use in the long term.

See § 33B-11, County Code.

Specifically, Section 33B-13(d)-(f) outlines environmental findings describing the "[d]angers resulting from uncontrolled development of the area," including:

(1)     Pollution of groundwater supply. Uncontrolled development within the area poses a serious threat to the quality of water recharged to the Biscayne Aquifer…
(2)     Pollution of surface water to Everglades National Park.
(3)     Reduction of surface water flow to Everglades National Park.
(4)     Reduction of groundwater recharge to Biscayne Aquifer.
(5)     Reduction of flood storage capacity.
(6)     Danger to development from flooding.
(7)     Danger to development from fire.
(8)     Loss of vegetation, pinnacle rock, wildlife.

The ordinance includes Division 2 titled, "East Everglades Zoning Overlay Ordinance." Division 2 describes which uses are allowed in the East Everglades, which uses require a conditional use permit, and which uses are prohibited. Although the title includes the word "zoning" in it, section 33B-26 includes "environmental performance standards." These standards are enforced by Miami-Dade County's Division of Environmental Resources Management ("DERM"). Division 2 sets the standards for conditional use permits, as well as the standards for variances.

The Ordinance divides the East Everglades into management areas. Management Area 2A is the most restrictive area in terms of land uses, filling land, excavating land, building roads and clearing native vegetation. See § 33B-25, 33B-26. For example, section 33B-26(c)(1) and (2) state that no roads shall be permitted in Management Area 2A.

### 3. FPL's Site Certification Application and Proceedings Below

FPL submitted a Site Certification Application to the Florida Department of Environmental Protection ("DEP"), pursuant to the PPSA. FPL sought approval for the Turkey Point Units 6 & 7 Project ("Project"). The Project included new electrical transmission lines and associated facilities in western Miami-Dade County.

After FPL filed is Site Certification Application, a lengthy certification hearing before the Administrative Law Judge ("ALJ") followed, at which numerous parties participated, including all the appellants. At the hearing, the City of Miami presented evidence regarding its land development regulations and why FPL was required to comply with those regulations. The City of Miami also outlined the problems raised with the placement of FPL's proposed poles, which in some cases were as tall as 105 feet, in the City of Miami's densely populated urban areas. The City of Miami presented evidence that the sea level and storm surges would be a problem for the proposed two nuclear reactors. It additionally

7

believed that FPL's proposed water uses for the facilities would harm wetlands, ground and surface waters, Biscayne Bay and the Biscayne Bay Aquatic Preserve. It contended that the DEP refused to consider local land development regulations or comprehensive plans to the transmission line portions of FPL's application, which it claimed the DEP was statutorily required to consider. Miami-Dade County also raised its objections, particularly because the western transmission line corridor would run through areas of the East Everglades.[3]

At the end of the certification hearing, the ALJ issued its Recommended Order approving the project. The ALJ approved FPL's West Preferred Corridor as a back-up western transmission corridor if adequate right-of-way could not be obtained in the primary corridor in a timely manner and at a reasonable cost. The transmission lines and roads in the West Preferred Corridor would be installed all within the current boundaries of both the East Everglades and Everglades National Park for approximately 6 miles. The Recommended Order did not consider local regulations, stating:

---

[3] The West Preferred Corridor would run along the west side of the L-31N canal for 7.4 miles between S.W. 120th Street and S.W. 8th Street/Tamiami Trail and would consist of dual 500-kV transmission lines and a single 230-kV line, along with access roads. The transmission lines and roads in the West Preferred Corridor would be installed entirely within the current boundaries of both the East Everglades and Everglades National Park for approximately 6 miles. The remaining 1.4-mile segment would run south along the L-31N canal to S.W. 120th Street and falls outside the Everglades National Park boundaries, but remains within the East Everglades.

"[DEP] interprets the [Act], and in particular section 403.509, to mean that there are no "applicable" local government comprehensive plans or [land development regulations] for the proposed transmission lines...

In addition, the Recommended Order did not require FPL to underground its lines. The parties opposed to the Recommended Order filed numerous exceptions. On May 19, 2014, the Siting Board, sitting as the head of the DEP, issued a Final Order on Certification ("Order"), in which it adopted the ALJ's Recommended Order.

### *Standard of Review*

An administrative agency's conclusions of law are reviewed de novo. Parlato v. Secret Oaks Owners Ass'n, 793 So. 2d 1158, 1162 (Fla. 1st DCA 2001). This is only with respect to statutory interpretation. Florida Statute, section 120.68(7)(d) states that "[t]he court shall remand a case to the agency for further proceedings consistent with the court's decision or set aside agency action, as appropriate when it finds that: …[t]he agency has erroneously interpreted a provision of law and a correct interpretation compels a particular action…"

Deference is given to administrative agencies, however a "court need not defer to an agency's construction if the language of the statute is clear and therefore not subject to construction." Doyle v. Dep't of Bus. Regulation, 794 So. 2d 686, 690 (Fla. 1st DCA 2001). Here, the statute is clear and unambiguous.

Thus, we review this case de novo and are not required to give deference to an agency's interpretation.

### *The Siting Board Failed to Consider Local Regulations, as required by section 403.509(3), Fla. Stat. (2013).*

We first address the City of Miami's contention that the Siting Board erred in not considering local regulations when certifying the transmission line corridors, as was required by section 403.509(3)(b), Florida Statute (2013). We agree with the City of Miami, as the applicable local regulations should have been applied.

The PPSA requires that the Siting Board apply the certification test outlined in section 403.509(4)(a). Criteria b) and c) state that the applied for project will comply with applicable nonprocedural requirements of agencies and be consistent with applicable local government comprehensive plans and land development regulations, respectively. Section 403.509(4)(a), Fla. Stat. (2013) states that "[a]ny transmission line corridor certified by the board...shall meet the criteria of this section."

In addition, "Nonprocedural requirements of agencies" is defined in section 403.503(21) as:

...any agency's regulatory requirements established by statute, rule, ordinance, zoning ordinance, land development code, or comprehensive plan, excluding any provisions prescribing forms, fees, procedures, or time limits for the review or processing of information submitted to demonstrate compliance with such regulatory requirements.

Section 403.503(2)'s definition of "agency" includes local governments. As such, section 403.509(3)'s certification test requires that local comprehensive plans and land development regulations be taken into account. The DEP and FPL both agreed that this was to be considered at the certification hearing. Therefore, the PPSA requires that local comprehensive plans, substantive conditions of zoning approvals, and other land development regulations be considered in the certification of power plants.

Here, the conditions of certification in the Final Order did not consider local regulations. As the City of Miami contends, the conditions of certification issued with the Siting Board's Final Order are the means by which the Board takes into consideration and incorporates local regulations. The ALJ's Recommended Order found that "there are no 'applicable' local government" regulations. The record that the Siting Board had before it was thus incomplete because the local regulations were not considered with respect to the transmission line corridors.

In addition, the Siting Board applied a "development" exception when it should not have it. Section 380.04 (3)(b), Florida Statute (2013), part of "The Florida Environmental Land and Water Management Act of 1972" defines "development" as:

Work done by an utility and other persons engaged in the distribution or transmission of gas, electricity, or water, for the purpose of inspecting, repairing, renewing, or construction on established rights-of-way any sewers, mains, pipes, cables, utility tunnels, power lines, towers, poles, tracks or the like…

11

The Siting Board incorrectly determined that transmission line corridors were excluded from consideration by the definition of "development." As the City of Miami contends, this is incorrect. The "development" exception does not apply to the entire corridor. The Siting Board certifies a corridor, not a right-of-way. According to the PPSA:

> (11) a "corridor" means the proposed area within which an associated linear facility right-of-way is to be located. The width of the corridor proposed for certification as an associated facility, at the option of the applicant, may be the width of the right-of-way or a wider boundary, not to exceed a width of 1 mile. The area within the corridor in which a right-of-way may be located may be further restricted by a condition of certification. After all property interests required for the right-of-way have been acquired by the licensee, the boundaries of the area certified shall narrow to only that land within the boundaries of the right-of-way...
> ***
> (27) "Right-of-way" means land necessary for the construction and maintenance of a connected associated linear facility, such as a railroad line, pipeline, or transmission line as owned by or proposed to be certified by the applicant...The right of way shall be located within the certified corridor and shall be identified by the applicant subsequent to certification in documents filed with the department prior to construction.

See § 403.503(11) and (27), Fla. Stat. (2013).

Consequently, the "development" exception cannot be applied to the entire width of the corridor. As the record reflects, the corridor is made up of parcels outside of established rights-of-way, some of which are privately owned. Thus, the Siting Board has no way of knowing if construction will take place within an established right-of-way or a private easement. The "development" exception thus cannot

12

exempt transmission line corridors from the PPSA's requirement that local land regulations are to be considered.

In addition, FPL contends that section 380.04 stands for the proposition that any work done by a utility company is not development, so land development regulations do not apply. We believe this argument to be misplaced and instead agree with the City of Miami that construction of a transmission line on land that is not established as a right-of-way constitutes "development." Section 380.04(3)(b) states that the "development" exception is limited to work conducted on "established rights-of-way." Courts that have interpreted this section use "established" with the word "existing." See Rinker Materials Corp. v. Town of Lake Park, 494 So. 2d 1123, 1126 (Fla. 1986); St. Johns Cnty. v. Dep't of Cmty. Affairs, 836 So. 2d 1034, 1037 (Fla. 5th DCA 2002).

This section uses "established," a past tense word. The use of the past tense in this statute indicates that the "development" exception only applies to existing rights-of-way. The Siting Board, in essence, struck the word "established" from the statute, which it is not permitted to do. Florida Dept. of Revenue v. Florida Mun. Power Agency, 789 So. 2d 320 (Fla. 2001). The right-of-way must be established, so there is no exemption from local regulations. And as the City of Miami contends, were this Court to accept FPL's argument on this issue, that an

established right-of-way is not the same as an existing or pre-existing right-of-way, this would make the word "established" meaningless.[4]

The Siting Board did not review or consider the City of Miami's LDR's, so the order on appeal does not incorporate the local regulations of the City of Miami into the conditions of certification that control the electrical transmission lines, as required by section 403.509(3), Fla. Stat. (2013). Accordingly, because the order did not comply with this statute, we reverse on this issue.

***The Siting Board Has the Power to Order Undergrounding of Transmission Lines***

We further reverse that portion of the Siting Board's Order where it erroneously determined that it lacked the authority to condition certification of FPL's project on FPL installing the power lines underground, at FPL's expense. As the City of Miami and the City of South Miami contend, the PPSA empowers the Siting Board to require FPL to bury these transmission lines.

Section 403.511 of the PPSA gives the Siting Board the power to make certification of FPL's application subject to the conditions set out in the Final Order. The general grant of power in the PPSA to "impose conditions" upon certification, other than those listed in the PPSA, gave the Siting Board the power to impose the condition of requiring that the power lines be installed underground,

---

[4]     Florida courts have held that a plan to create a right-of-way in the future is not a right-of-way.  See Clipper Bay Investments, LLC v. State Dep't of Transp., 117 So. 3d 7 (Fla. 1st DCA 2013).

14

at FPL's expense. See § 403.511(1), Fla. Stat.; § 403.511(2)(b)(2). Undergrounding of the transmission lines is a condition upon certification encompassed by the Siting Board's ability to impose "site specific criteria, standards, or limitations" on FPL's project. As such, the Siting Board had the power to require it, contrary to the Siting Board's conclusion that it had no such power.[5] Accordingly, reversal is required on this point.

FPL contends that Florida Power Corp. v. Seminole County, 579 So. 2d 105, 108 (Fla. 1991) stands for the proposition that requiring undergrounding of the transmission lines is outside of the Siting Board's jurisdiction. We disagree with FPL's interpretation of this case.

In Seminole, Seminole County and the City of Lake Mary were trying to mandate Florida Power Corporation (FPC) to convert overhead lines to underground lines on a stretch of road in question. Id. at 106. The City and County

---

[5] In its Final Order of Certification, the Siting Board adopted the ALJ's conclusion that "as a matter of law. . . the PPSA preempts a local government's authority to regulate transmission lines that extend through several local government jurisdictions." A fair reading of the Final Order of Certification, in context, leads us to conclude that the Siting Board determined it did not have the authority to require undergrounding of transmission lines as a condition of certification. As we explain in this opinion, we conclude that the Siting Board does have such authority, although we express no opinion on the merits of the issue. We recognize that the Final Order of Certification contains a discussion of the ALJ's factual findings regarding the increased cost and effectiveness of such a proposition. Our holding in this regard should not be interpreted as requiring that additional hearings be held or additional evidence taken, only that the Siting Board is within its authority to consider such an issue and should exercise that authority as it deems appropriate.

15

decided to widen Lake Mary Boulevard. The City enacted ordinances requiring FPC to relocate its power lines underground and stating that FPC bear the cost of undergrounding. The County's ordinance did not specify who would pay the cost of placing the power lines underground, but the County stated that it would not do so. Id.

FPC sued the City and the County for a declaratory judgment and injunctive relief, admitting it was obligated under section 337.403(1), Florida Statutes (1989), to relocate the lines overhead within the new right of way at its expense. Id. However, FPC contended that it would cost an additional $1,250,000 to place the lines underground, and it would place the lines underground only if the City and the County would bear the additional cost. Following trial, the circuit judge upheld the validity of the ordinances. Id.

On appeal, FPC asserted that the ordinance invaded the exclusive authority of the Public Service Commission (PSC) to regulate rates and service. Id. FPC argued that if the ordinances were upheld, similar ordinances would follow and that the cost of converting all of FPC's lines to underground lines would exceed $2.5 billion. Both the City and the County relied on section 337.403(1), Florida Statutes (1989), which the circuit judge cited as authority for his ruling. Id.

The Supreme Court of Florida ruled in favor of FPC. Id. The Court stated that section 366.04(1), Florida Statutes (1989), expressly confers jurisdiction on

16

the Public Service Commission to "regulate and supervise each public utility with respect to its rates and service." Id. The Court stated that the Public Service Commission has broad powers in the exercise of its "exclusive and superior" jurisdiction, including:

> [the] power to prescribe fair and reasonable rates and charges, classifications, standards of quality and measurements, and service rules and regulations to be observed by each public utility; to require repairs, improvements, additions, and extensions to the plant and equipment of any public utility when reasonably necessary to promote the convenience and welfare of the public and secure adequate service or facilities for those reasonably entitled thereto; ... and to prescribe all rules and regulations reasonably necessary and appropriate for the administration and enforcement of this chapter.§ 366.05(1), Fla. Stat. (1989).

Id. at 106-07. The Court reasoned that if FPC has to expend large sums of money in converting its overhead power lines to underground, these expenditures will necessarily be reflected in the rates of its customers. The Court did not believe that the statute granted the County the authority to regulate public utilities and that such authority rested exclusively with the Public Service Commission. Id. at 107.

The Court went on to state that "if there was any doubt that the legislature did not intend that cities and counties could dictate the decision of whether public utilities should convert their overhead systems to underground, this was laid to rest by the enactment of section 366.04(7)(a), Florida Statutes (1989)," which provides in pertinent part that:

> By July 1, 1990, the commission shall make a determination as to the cost-effectiveness of requiring the installation of underground electric utility

17

distribution and transmission facilities for all new construction, and for the conversion of overhead distribution and transmission facilities to underground distribution and transmission facilities when such facilities are replaced or relocated.... Upon a finding by the commission that the installation of underground distribution and transmission facilities is cost-effective, the commission shall require electric utilities, where feasible, to install such facilities.

Id. at 108. The Court stated, "Permitting cities or counties to unilaterally mandate the conversion of overhead lines to underground would clearly run contrary to the legislative intent that the Public Service Commission have regulatory authority over this subject." Id.

We find the Seminole case to be distinguishable because the Court said nothing in that case regarding whether undergrounding may be required as a condition of certification in the licensing of a transmission line corridor. In addition, the Supreme Court's determination regarding the Public Service Commission was based on statutory language that the Legislature has since deleted from this section. The Seminole holding was made in the context of rate-making with regard to the power vested in the Public Service Commission and not in the context of any of the Siting Board's powers. The Siting Board's power in no way infringes on the PSC's authority with regard to rate-making, and there is no conflict with the PSC's role. The Seminole case is simply inapplicable to the case before us.

***The Siting Board Erred in Interpreting the County's East Everglades Ordinance as a Zoning Ordinance Rather than as an Environmental Regulation***

18

Turning now to Miami-Dade County's contention that the Siting Board erred in interpreting the County's East Everglades Ordinance, we believe that the substance and legislative history of the ordinance demonstrate that the ultimate purpose of the East Everglades Ordinance is to protect the environment in the Everglades.[6] Thus, we agree with the County that the East Everglades Ordinance is primarily an environmental regulation.

In coming to this decision, we note that it appears that the Siting Board decided that Chapter 33B is a zoning regulation because one of its divisions is titled "East Everglades Zoning Overlay Ordinance." In its Order, the Siting Board stated "MDC has adopted the East Everglades regulations as part of its Zoning Code, it cannot now be allowed to unilaterally change the nature or expand the scope of those regulations to suit its purposes in this proceeding." This statement was incorrect.

The County's Zoning Code is codified as Chapter 33 of the Miami-Dade County Code. As previously discussed, the East Everglades Ordinance is codified as Chapter 33B. It is a separate chapter titled "Areas of Critical Environmental Concern." Although it appears adjacent to the zoning code, it is not part of it. As the County points out in support of its position, Chapter 28 of its Code addresses

[6] At oral argument, FPL's counsel conceded that the purpose of chapter 33B was to "protect the natural resources and environmental values" in the East Everglades area.

19

"Subdivisions," while chapter 28A addresses "Seaport Security and Operations." Chapter 8 is titled, "Building Code," while chapter 8A is the code of "Business Regulations." Just like these adjacent chapters make it clear that they are not related to each other, chapter 33B is not related to chapter 33. These two chapters are distinct, and Chapter 33B is not an appendix to chapter 33.

The County contends that the character of a law is determined by its purpose and operation, not its titles or headings. The United States Supreme Court held in United States v. Constantine, 296 U.S. 287, 294 (1935) that courts "must ascribe to [a regulation] the character disclosed by its purpose and operation, regardless of name." The subchapter heading cannot substitute for the operative text of the statute." Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc., 554 U.S. 33, 47 (2008).  In addition, the County Code specifies that section headings are not to be considered as part of the regulation: "The catchlines of the several sections of this Code printed in boldface type are intended as mere catchwords to indicate the contents of the section and shall not be deemed or taken to be titles of such sections, nor as any part of the section, nor, unless expressly so provided, shall they be so deemed when any of such sections, including the catchlines, are amended or reenacted." See § 1-3, County Code. Furthermore, the title or section heading does not determine its meaning. See Whitman v. American Trucking Assocs., 531 U.S. 457, 482-83 (2001).  Thus, the Siting Board's determination that

20

Chapter 33B is a zoning regulation was erroneous because it focused on the title of the chapter as opposed to its environmental character.

In addition, the text of Chapter 33B indicates that it is an environmental regulation. Section 33B-13, Division 1, outlines the "environmental findings" which focuses on the protection of water flow, water quality and quantity, and native wildlife in the East Everglades. Division 2 states its purpose is to protect and preserve the environmental values of the East Everglades. As previously discussed, the "Zoning Overlay" division lists "environmental performance standards" and regulates issues such as fill, excavation, and roads and their environmental impacts." See § 33B-26(c)(1). The Ordinance is how the County implemented the East Everglades Resources Planning Project's "Proposed Management Plan for the East Everglades." The Management Plan's main concern was the area's freshwater resources, its wildlife and its vegetation, and the impact of future development on those resources," in addition to "the long term health of the water supply."

The East Everglades Ordinance is administered mainly by DERM, not the County's zoning department. Moreover, the land use components that are included in the ordinance are designed to address environmental impacts, such as water pollution, reduction in the supply of water to the Everglades, reduction of groundwater recharge to the Biscayne Aquifer, and reduction of flood storage capacity. See § 33B-13(d), 33B-25, 33B-28. All of these factors together leads us

to the conclusion that the ALJ erred in determining that 33B was a zoning regulation, and the Siting Board erred in accepting the ALJ's findings.

Consequently, because the East Everglades Ordinance is an applicable, non-procedural environmental requirement of the County, very similar to Chapter 24 of the County Code, which is the County's environmental regulatory code, FPL cannot install the transmission lines and roads proposed in its project without requesting a variance. [7] Chapter 33B expressly prohibits roads, does not permit transmission lines anywhere in the East Everglades, and greatly restricts the amount of wetland filing in the area. FPL never requested these variances. There is no evidence in the record that notice was given that these variances would be considered. The East Everglades Ordinance required public notice and an

---

[7] Chapter 24 of the Miami-Dade County Code is titled "Environmental Protection, Biscayne Bay and Environs Designated Aquatic Park and Conservation Area, The Biscayne Bay Environmental Enhancement Trust Fund, and the Environmentally Endangered Lands Program. Section 24-2, "Declaration of Legislative Intent" states:

The Board further finds it necessary to maintain within Miami-Dade County a freshwater wetlands management program for the purposes of providing adequate water levels, flood control, water conservation, protection of water quality and recharge to the Biscayne Aquifer, and prevention of saltwater intrusion; for the maintenance of the biological integrity of freshwater wetlands in Miami-Dade County; for the protection of the interrelated natural functions between Miami-Dade County's wetlands and the natural systems in Everglades National Park; for managing freshwater wetland resources in accordance with environmental standards and management criteria as recommended by the Miami-Dade County Comprehensive Development Master Plan and Chapter 33B of the Code of Miami-Dade County, Florida, as amended from time to time; and providing for cooperation with federal, State, and local agencies and authorities.

22

opportunity to be heard for any conditional uses or variances being approved. See § 33B-27(b)(2). Because FPL cannot construct the transmission lines and roads on the west side of the L-31N canal without these variances, FPL's proposed West Preferred Corridor project could not have been approved.

The PPSA requires applicants to request any "variance, exemption, exception, or other relief" that would be required to comply with the applicable, non-procedural regulations of agencies such as the County, that are parties to the certification proceeding.  The only way for the applicant to not have to comply with this requirement is if the agency has failed to provide notice in the site certification proceeding that the regulations are applicable. See § 403.507(3)(a), Fla. Stat.

Here, the County filed an Agency Report on the West Preferred Corridor that outlined all the requirements of Chapter 33B, including Section 33B-28, as County regulations that apply to FPL's project in question. The Agency Report stated that roads and fill pads would be prohibited in certain areas under Chapter 33B. The County's Report also stated:

> The portion of the project proposed in the East Everglades Area of Critical Environmental Concern shall be relocated outside the Easter Everglades or not be constructed unless the project is modified to meet all requirements of County Code Chapter 24 and 33B including but not limited to the Section 33B-28 and provided the portions of the corridor are built with road less construction techniques and without fill pads for the transmission lines. Furthermore, additional modification of project design in this area would be required to avoid all permanent impacts to rare, threatened and

23

endangered species by techniques such as undergrounding, and FPL shall be responsible for the cost associated with undergrounding transmission lines.

Because FPL did not apply for the necessary variances from Chapter 33B, it was a violation of due process for the Siting Board to grant them. A court must set aside any agency action if a notice does not adequately identify the matters that the agency will consider. Florida Optometric Ass'n v. Dep't of Prof'l Reg., Bd. Of Opticianry, 567 So. 2d 928, 934 (Fla. 1st DCA 1990). With regard to public notice, "notice must adequately inform as to what changes are proposed, and the actual change must conform substantially to the proposed changes in the notice." Williams v. City of N. Miami, 213 So. 2d 5, 7 (Fla. 3d DCA 1968).

In addition, even if the variances had been requested and considered, FPL presented no competent substantial evidence that the project could satisfy the environmental performance standards requirements of Chapter 33B. Variances must satisfy the same standards as conditional uses. See § 33B-31. Here, the West Preferred Corridor cannot satisfy the East Everglades Ordinance's variance standards because the corridor would adversely impact the environment and the ecology of the land and its wildlife.

Section 33B-28 states that a conditional use permit may be granted only if the applicant demonstrates that:

(a) The conditional use is consistent with the purposes, goals, objectives and standards of the East Everglades Management Plan;…

24

The proposed use, singly or cumulatively, will not have any of the following irreversible effects on the ecological integrity of the East Everglades:

(1) Harmful obstruction or undesirable alteration of the natural flow of water within the area of work.

(2) Harmful or increased erosion, or adverse environmental impact resulting from changes in water quality or quantity.

(3) Adverse impact upon wetland flora and fauna within adjacent parcels.

(4) Adverse impact upon wetland flora and fauna within those portions of the subject property not proposed for development under the application…

Under these restrictions, FPL's application cannot be approved under the facts before us. For example, filling land and constructing structures in the proposed area would affect sheet flow and the hydrological resources of the area. FPL's application proposed filling is up to 137 acres of the 296-acre right-of-way. Filling wetlands in this area would create barriers to water flow. The effect on the area's hydrology would destroy the plant species that supplies the base for the food chain in the ecosystem and will adversely affect the endangered birds that nest and feed on the west side of the L-31N canal. In addition, these adverse impacts would also affect the County's water supply.

The roads that FPL would need to build for the construction of the project would affect the sheet flow in the area. Roads would have to be elevated in some areas so that vehicles could avoid the high water levels in this part of the East Everglades. The Siting Board permitted FPL to construct roads using culverts, which is a drain or channel crossing under a roadway. Section 33B-26 maintains

that a variance is needed to install elevated roads or culverts. FPL alleged that it could build a road with enough culverts to mitigate disrupting sheet flow west of the L-31N canal.

The record on appeal indicates that FPL's hydrology expert admitted that FPL had not conducted any analysis of the actual flow of water from one side of the transmission lines to the other. In addition, FPL's experts did not enter the Park when they conducted their field visits. The structure pads and roads would change the local hydrology and ecology of the subject area. These changes would have an irreversible ecological effect on the Everglades that would result from "[h]armful obstruction or undesirable alteration of the natural flow of water." § 33B-28(e)(1). In sum, the evidence was insufficient to support a variance to allow roads and culverts in Management Area 2A.

With regard to FPL's project's impact to endangered birds, the Siting Board stated that "there will be no adverse impacts on avian species." However, the record supports the opposite – that the endangered avian species would be greatly impacted. Filling wetlands in the manner proposed by FPL's project, for example, would irreversibly affect endangered species in the subject area. The East Everglades wetlands are home to a number of federally-listed endangered species. Two of these species, the wood stork and the snail kite, nest and forage for food very close to or in the West Preferred Corridor. Filling wetlands in the area would

destroy the foraging habitat of these birds. The FPL's proposed roads and structure pads have side slopes not suitable for producing food sources. The fill would change the microclimate in the area, rendering the area less suitable for apple snails, which snail kites feed almost exclusively on and other food sources for the wood stork. In addition, snail kites nest in woody vegetation, and FPL removes woody vegetation under power lines. FPL submitted no competent substantial evidence that the approved conditions of certification would adequately address the risk to these endangered birds.

There is also risk that the birds will collide with the transmission poles and lines proposed by FPL, particularly young birds that have not yet learned how to avoid obstacles. There is no competent substantial evidence that the proposed facilities will comply with the County's East Everglades Ordinance. The conditions in the Order do not address the loss of foraging or the potential loss of protected birds. Furthermore, the Order approves mitigation techniques such as perch discouragers and flight diverters so birds can identify and avoid poles and wires. This finding was not supported by competent substantial evidence because it fails to satisfy the variance criteria that the proposed use not have an "irreversible effect[] on the ecological integrity of the East Everglades" that would result from "adverse impact upon wetland flora and fauna". 33B-28(e)(3),(4). The mitigation

technique presumes that some of the species are going to die. And that simply is not the standard under chapter 33B.

### *Conclusion*

We therefore reverse the Final Order and remand to the Siting Board for further review consistent with local developmental regulations, comprehensive plans and the applicable environmental regulations, as discussed in this opinion.

Reversed and remanded.